# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### WESTERN DIVISION

IN RE:

                                                            **Case No. 05-71715-CMS-7**

**DANIEL BISHOP**
                 Debtor.

**BUCKEYE RETIREMENT CO., LLC,**
**LTD.,**

             **Plaintiff,**

**v.**                                             **AP No. 05-70042-CMS**

**DANIEL BISHOP,**

             **Defendant.**

## <u>MEMORANDUM OF DECISION</u>

This matter came before the court on July 23, 2008, for trial on Buckeye Retirement Co., LLC, Ltd.'s ("Plaintiff") Objection to Discharge and Dischargeability. (AP Doc. 1, as last amended AP Doc. 59). William M. Hancock appeared on behalf of the Plaintiff and Tim R. Wadsworth appeared on behalf of Daniel Bishop ("Debtor"). After consideration of the evidence submitted at trial and the arguments of counsel this court **OVERRULES** the Objection to Discharge pursuant to 11 U.S.C. § 727(a)(3), (4), & (5). This court also **OVERRULES** the Objection to Dischargeability pursuant to § 523(a)(2).

## JURISDICTION

The Bankruptcy Court has jurisdiction of Debtor's Chapter 13 case pursuant to 28 U.S.C. § 1334(a). This court has jurisdiction of this issue, a core bankruptcy proceeding, pursuant to 28

1

U.S.C. § 1334(b). Jurisdiction is referred to the bankruptcy courts by the General Order of Reference of the United States District Courts for the Northern District of Alabama, Signed July 16, 1984, As Amended July 17, 1984.

## FINDINGS OF FACT

Debtor filed a voluntary individual Chapter 7 bankruptcy petition on June 9, 2005. Prior to filing such petition, Debtor was the owner and operator of two distinct legal entities: Bishop Joint Sealing, Inc. ("Bishop Joint Sealing"), which was incorporated on August 10, 2000, for the purpose of repairing and sealing cracks in airport runways and roads; and Bishop Rentals, LLC ("Bishop Rentals"), which acted as a holding company for Debtor's numerous rental properties.[1] Despite owning and operating two businesses, it is clear that Debtor was neither an educated man nor a financially sophisticated man. Debtor testified that he had always earned a living by doing manual labor and that the highest grade of school he completed was the sixth. Debtor further testified that he could not read a newspaper or write a letter, but that he could sign his name.

Debtor's original schedules indicate that he owned real property valued at $1,355,650.00 and personal property valued at $177,860.00 at the time he filed this bankruptcy petition. Debtor subsequently amended his schedules to indicate that he owned real property valued at $1,699,720.00 and personal property valued at $293,999.75. The vast majority of the real and personal property listed in Debtor's schedules were utilized in one of the two businesses entities that Debtor owned and operated. Neither of these entities are involved in this or any other bankruptcy proceeding. Neither of these entities generates any income for the Debtor, as Debtor ceased the operations of both

_____

[1]Although Bishop Joint Sealing and Bishop Rentals were distinct legal identities, they were operated by the Debtor in the same office space with the same employees.

Case 05-70042-CMS    Doc 128    Filed 02/06/09    Entered 02/06/09 15:13:10    Desc Main
Document      Page 2 of 28

businesses shortly before the filing of this bankruptcy petition. Other than the tax returns introduced into evidence and the titles to two vehicles, there was no evidence as to whether title to real and personal property was in the Debtor individually, or in one of his two businesses.

The indebtedness Debtor owes to Plaintiff, as successor to Community Bank, arises out of two notes and security agreements. The first note and security agreement relates to loan number 45007977 which is dated June 26, 2002, and is a renewal of a prior note in the amount of $42,056.37 ("Loan 1"). (Plaintiff's Exhibit 6). Loan 1 was signed June 26, 2002, by Daniel Bishop and Daniel Bishop d/b/a Bishop Joint Sealing. The purpose of Loan 1, as stated in the note and security agreement, was "refinance and repair to equipment." The security agreement shows that the Debtor received $30,000.00 and $11,981.37 was paid on his prior loan. The second note and security agreement is dated July 1, 2002, and is an original loan in the amount of $30,075.00 ("Loan 2"). Loan 2 was signed July 1, 2002, by Daniel Bishop and Daniel Bishop d/b/a Bishop Joint Sealing. The purpose of the loan, as stated in the security agreement, was to "purchase additional equipment." (Plaintiff's Exhibit 9). The Debtor received $30,000.00. Both notes and security agreements have the following items of equipment listed as collateral: a 1995 GMC MB truck titled in the name of "Bishop Daniel d/b/a Bishop Joint Sealing, Inc." with an original lien date of November 1, 2000; a 1995 Ford F150 titled in the name of "Bishop Joint Sealing" with an original lien date of September 26, 2000; and a Tymco 600 w/sweeper ("Sweeper").

As part of the application process for Loan 1, a Consumer Credit Application was executed by the Debtor on June 27, 2002. (Plaintiff's Exhibit 10). The Consumer Credit Application lists income from two sources: a take home salary of $11,000.00 per month and income from rental property of $6,000.00 per month. The Consumer Credit Application also lists three debts: two debts

3

owed to Community Bank with a notation that they were to be paid with this loan and a third debt owed to First Premier with a $178.00 balance. The Consumer Credit Application requested $42,000.00 to be used for renewal and repair to equipment. The Debtor signed it on June 27, 2002, but the top right hand corner indicates that the loan was approved on June 26, 2002. Prior to the execution of the Consumer Credit Application, the Debtor executed a Statement of Financial Condition dated April 25, 2002. The Statement of Financial Condition listed the value of Debtor's assets at $2,965,300.00 and listed the Debtor's liabilities at $1,100,361.82. There was no income from real property listed. The Statement of Financial Condition was contained in Community Bank's file for the Debtor. There is no Consumer Credit Application or Statement of Financial Condition for Loan 2.[2]

The notes executed as part of Loan 1 and Loan 2 ("Notes") were assigned to Plaintiff in April of 2004.[3] Subsequent to the assignment, the Debtor defaulted under the terms of the Notes, and Plaintiff obtained a judgment against Debtor on March 7, 2005, in the amount of $77,191.82. The Sweepers were repossessed by Plaintiff in May 2005. The Plaintiff is now owed $55,299.38, plus interest at 7.50% from June 9, 2005. It is this debt that Plaintiff alleges is nondischargeable.

Shortly after the Sweepers were repossessed, Debtor ceased operating Bishop Joint Sealing. Debtor did not file an Article of Dissolution with the State or conduct any winding down of the company. In addition to Bishop Joint Sealing, Debtor also owned and operated Bishop Rentals

---

[2]The testimony at trial indicated that the loan officer who approved Loan 2 probably would have considered the Consumer Credit Application and Statement of Financial Condition filled out for Loan 1.

[3]In April of 2004, the Notes were transferred from Community Bank to SNGC, LLC. In April of 2004, the Note was again transferred from SNGC, LLC to Plaintiff.

4

which acted as a holding company for Debtor's numerous rental properties. Debtor purchased homes in foreclosure from various banks,[4] repaired and refurbished the homes, and then rented them. Debtor testified that Bishop Rentals never made more in rent from a house than the mortgage payment, but that he planned to have the mortgages paid in approximately three years so that the remaining rent payments would be straight profit. Debtor also testified that he got behind on payments to the IRS prior to the bankruptcy petition,[5] and that the IRS began intercepting rental payments from Bishop Rentals' tenants.[6] Without the rental income, Bishop Rentals did not have the money to pay the monthly mortgage payments and many of the rental properties were foreclosed upon. These foreclosures, coupled with the repossession of the Sweepers by the Plaintiff,[7] cut off both sources of Debtor's income. It was at this point that Debtor was forced to filed bankruptcy.

During the pendency of Debtor's case, Plaintiff filed this adversary proceeding seeking the denial of Debtor's general discharge and a determination of nondischargeability for Plaintiff's debt. At trial, the parties stipulated to the admissibility of numerous documents. Plaintiff's Exhibit 26 is a Table of Content of Documents Produced by Bishop and 3rd Parties. This is a nine page list of

---

[4]The evidence submitted at trial indicates that banks actually called the Debtor personally on numerous occasions to sell him property the bank had foreclosed.

[5] Proof of Claim #32 indicates that the IRS was due $193,694.92 at the time the Debtor filed his bankruptcy petition.

[6]Debtor was not able to say which tenants were paying rent to the IRS and which tenants were not paying rent at all.

[7]Many assets of the Debtor were either repossessed or foreclosed upon prior to the filing of the bankruptcy petition. In addition, many assets were repossessed post-petition as evidenced by the numerous orders in the bankruptcy file granting creditors relief from the automatic stay to take possession of their property.

5

various documents produced. Defendant also submitted Bishop's Evidentiary Submission List which included numerous documents. Attached as Defendant's Exhibit 17 is a copy of the Debtor's Response to the Plaintiff's Request for Production, which included numerous bank account records.

Also included in the exhibits admitted into evidence are copies of tax returns of Daniel Bishop, Bishop Joint Sealing, and Bishop Rental. Defendant's Exhibit 10 is a copy of Bishop Joint Sealing's 2002 tax return. This return was prepared by Ronnie Ingle ("Ingle"), Debtor's CPA, and shows that the corporation is an S corporation. Included with the tax return is a depreciation schedule with the corporation's assets, a summary of the interest paid to banks, a balance sheet showing assets and liabilities, and a profit and loss statement for 2002. The return shows an income of $110,111.00. Defendant's Exhibit 15 is a copy of Bishop Joint Sealing's 2003 tax return. Attached to this return are similar schedules, including balance sheets, depreciation schedules, and profit and loss statements. The return shows a loss of $201,362.00. Defendant's Exhibit 12 is a copy of the corporation's 2004 tax return. Included with this tax return is a balance sheet, as well as a profit and loss statement. The return shows income of $47,032.00.

The Debtor also produced copies of Bishop Rentals' tax returns. Defendant's Exhibit 9 is a copy of the 2002 tax return. Included in this return is a list of all the houses owned by Bishop Rentals, including the cost and depreciation, as well as a balance sheet for Bishop Rentals. For the 2003 and 2004 tax years, Ingle included Bishop Rentals' return within the Debtor's individual return. Defendant's Exhibit 14 is a copy of the Debtor's individual 2003 tax return, which includes income and/or loss attributed to Debtor from Bishop Joint Sealing and Bishop Rentals. Also included with the return is a list of Bishop Rentals' assets, with depreciation schedules, income and expenses for Bishop Rentals. Defendant's Exhibit 13 is a copy of the Debtor's individual tax return for 2004,

6

which again includes Bishop Rentals' asset, income and expense information. While there was some dispute as to how many houses were owned by Bishop Rentals,[8] Debtor's tax return shows that at the end of 2002 Bishop Rentals owned 42 houses and 6 mobile homes. A subsequent tax return indicates that Bishop Rentals still owned 42 houses and 6 mobile homes at the end of 2003.

In addition to the actual production of documents, there was also testimony as to how the Debtor generally kept his records. At all times relevant to this adversary proceeding, the following people worked in the Debtor's office and maintained the Debtor's books and records: Debtor's wife, now his ex-wife; Wendy Burleson, his daughter; and Karen Nix Warren ("Warren"). Warren was hired in 2004 and was called to testify at this trial. Both Warren and the Debtor testified that the records for Bishop Rentals consisted of file folders for each parcel of real estate, which included copies of the deeds, notes and mortgages, as well as a record of rental payments. A receipt book was also maintained for the rental payments. Warren further testified that she kept up with the rental payments and prepared deposit slips identifying the house number and the amount of rent received. Both Warren and the Debtor also testified that the records for Bishop Joint Sealing consisted of monthly files in which records of all income, including the income deposited into the corporation's account, and expenses were maintained. The records of Bishop Joint Sealing and Bishop Rentals were provided to Ingle, the Debtor's CPA at all times relevant to this adversary proceeding, to prepare the tax returns. Debtor testified that he could not recall the amount of money withdrawn from the Bishop Joint Sealing account every month because either his daughter or Ingle would pay his personal expenses and monthly bills out of such account. In addition, Debtor testified that he

---

[8] Debtor testified that he thought Bishop Rentals owned between 30 and 35 homes. Plaintiff claims that there were at least 50.

7

loaned money to various people, but that he could not provide any documentation, i.e., notes or proof of payment, for these loans because he kept the information written on a small notepad he carried in his shirt pocket. Debtor listed these as accounts receivable on his Schedule B and testified about them at trial. It turns out that four of the people that owe Debtor money are deceased. In addition, two of the people that owe Debtor money are his relatives: one is his sister and the other is his niece. The balance of the accounts receivable are for rent on his various rental properties. Debtor testified that he is no longer in possession of the notepad.

## CONCLUSIONS OF LAW

The issues before this court are whether the Debtor should be denied a general discharge pursuant to § 727 of the Bankruptcy Code[9] and whether the debt owed to Plaintiff is nondischargeable pursuant to § 523. Plaintiff alleges that Debtor should be denied a general discharge pursuant to §§ 727(a)(3), 727(a)(4)(A), & 727(a)(5). Plaintiff also alleges that its debt should be declared nondischargeable pursuant to § 523(a)(2). The causes of action relating to § 727 shall be addressed first because if the Debtor is denied a general discharge, all the debts that Debtor owes will be nondischargeable, and there will be no need to determine whether the debt owed to Plaintiff is nondischargeable pursuant to § 523(a)(2).

### I. Section 727

Section 727 provides, in pertinent part, that:

(a) The court shall grant the debtor a discharge, unless-

> (3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or

---

[9]All section references are to the Bankruptcy Code unless stated otherwise.

business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;

(4) the debtor knowingly and fraudulently, in or in connection with the case-
       (A) made a false oath or account;

(5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities;

11 U.S.C. § 727. "[Section] 727 of the Bankruptcy Code allows debtors to receive a general discharge of their obligations in keeping with the primary purpose of bankruptcy law, to give honest debtors a fresh start 'unhampered by the pressure and discouragement of preexisting debt.'" Farouki v. Emirates Bank Int'l, Ltd., 14 F.3d 244, 249 (4th Cir. 1994) (quoting Lines v. Frederick, 400 U.S. 18, 19, 91 S. Ct. 113, 114, 27 L. Ed. 2d, 124 (1970)). A leading treatise on bankruptcy law provides:

The provisions denying a discharge to a debtor are generally construed liberally in favor of the debtor and strictly against the creditor. Courts have noted that "a total bar to discharge is an extreme penalty." The reasons for denial of discharge must be real and substantial rather than technical and conjectural. However, "[w]hile the law favors discharges in bankruptcy, it will not ordinarily tolerate the [debtor's] intentional departure from honest business practices where there is a reasonable likelihood of prejudice."

6 Collier on Bankruptcy ¶ 727.01[4] (15th ed. rev. 2008). See also Micro Connections, Inc. v. Shah (In re Shah), 388 B.R. 23, 32 (Bankr. E.D.N.Y. 2008) (stating that because a discharge is vital to the fresh start contemplated by bankruptcy, § 727, which provides grounds for the denial of a debtor's discharge, "must be strictly construed against the party objecting to the debtor's discharge and liberally in favor of the debtor" ).

In a trial on a complaint objecting to a discharge, the plaintiff bears the burden of proving that

9

a discharge is unwarranted. FED. R. BANKR. P. 4005. To carry its burden, the plaintiff must prove

such discharge is unwarranted by a preponderance of the evidence. <u>Grogan v. Garner</u>, 498 U.S. 279,

287, 111 S. Ct. 654, 112 L. Ed. 2d 755 (1991). If the plaintiff establishes a prima facie case, the

burden shifts to the debtor to make a credible explanation of his actions. <u>Buckeye Retirement Co.,</u>

<u>L.L.C. v. Howells (In re Howells)</u>, 365 B.R. 764, 768 (Bankr. N.D. Ohio 2007).

To establish a prima facie case under § 727(a)(3), Plaintiff must establish by a preponderance

of the evidence that: (1) Debtor either failed to keep or preserve any recorded information, or

committed an act of destruction, mutilation, falsification, or concealment of any recorded

information; and (2) that as a result of such failure or act, it is impossible to ascertain the financial

condition and material business transactions of the Debtor. 11 U.S.C. § 727(a)(3); <u>Howells</u>, 365

B.R. at 768; <u>Lewis v. Summers (In re Summers)</u>, 320 B.R. 630, 638 (Bankr. E.D. Mich. 2005).

> The debtor's obligation to present records of financial information is intended to protect the
> trustee and creditors by enabling them to determine or confirm the debtor's financial
> condition and the cause of the debtor's financial difficulty. The records need not be in any
> particular form; however, they must be sufficient to "enable his creditors reasonably to
> ascertain his present financial condition and to follow his business transactions for a
> reasonable period in the past."

6 COLLIER ON BANKRUPTCY ¶ 727.03[3][a] (15th ed. rev. 2008). <u>See also</u> <u>Colonial Bank v.Wynn</u>

<u>(In re Wynn)</u>, 261 B.R. 286, 299 (Bankr. M.D. Ala. 2001); <u>Peterson v. Scott (In re Scott)</u>, 172 F.3d

959, 969 (7th Cir. 1999); <u>Meridian Bank v. Alten</u>, 958 F.2d 1226, 1230 (3rd Cir. 1992) . All books

and records that are necessary to understand a debtor's financial condition are within the scope of

§ 727(a)(3). <u>First Union Nat'l Bank v. Golob (In re Golob)</u>, 252 B.R. 69, 76 (Bankr. E.D. Va. 2000).

The records which are required to determine a debtor's financial condition differ from case to case,

with a sophisticated business debtor being held to a higher standard than an unsophisticated,

uneducated debtor.  Id.  See also In re Wynn, 261 B.R. at 300 (stating that the following factors were relevant in a § 727(a)(3) proceeding: "debtor's education, the sophistication of the debtor, debtor's business experience, the size and complexity of debtor's business, debtor's personal financial structure, and any special circumstances that may exist").  "If the nature and extent of the debtor's transactions were such that others in like circumstances would ordinarily keep financial records, the debtor must show that because of unusual circumstances there was no duty to keep them."  6 COLLIER ON BANKRUPTCY ¶ 727.03[3][b] (15th ed. rev. 2008).

In response to Plaintiff's discovery requests, Debtor produced individual tax returns and individual bank statements.  Debtor also produced the following in relation to his businesses: balance sheets, bank statements and tax returns for Bishop Joint Sealing, folders for each house that he rented through Bishop Rentals which included the rent to be paid by each tenant, as well as the notes and mortgages for each rental house, bank statements for Bishop Rentals, and the tax returns for Bishop Rentals.  However, Plaintiff alleges that the Debtor failed to keep or preserve the following records that are required to ascertain the Debtor's financial condition: (1) bid sheets, contracts, job orders, cost orders, and work orders  related to the jobs performed by Bishop Joint Sealing; (2) profit/loss statements for Bishop Joint Sealing; (3) accounts receivable or payable, invoices, and receipts for Bishop Joint Sealing; (4) travel logs and expense accounts for Bishop Joint Sealing; (5) general or payroll ledgers for Bishop Joint Sealing; (6) QuickBooks ledgers for Bishop Joint Sealing;[10] (7) customer lists for Bishop Joint Sealing; (8) receipts, expense ledgers, or work orders for the repairs

_____

[10]The deposition of the Debtor's accountant, Ronnie Ingle, was introduced into evidence. He testified that Bishop Joint Sealing used the accounting software QuickBooks, but that only one month's worth of QuickBooks ledgers were produced.  The Plaintiff believes that there are other ledgers in existence that the Debtor did not produce.  Karen Nix Warren was not aware of any such ledgers being created while she was employed.

11

made on the houses held by Bishop Rentals; and (9) accounting printouts or disks used in Bishop

Rentals. All of the records that were not produced and that Plaintiff alleges are necessary to

ascertain the Debtor's financial condition are related to either Bishop Joint Sealing or Bishop

Rentals, the business entities owned by the Debtor prepetition.

> [A]n individual debtor's failure to maintain books and records of a corporation is not in itself sufficient to deny that debtor a discharge under § 727(a)(3) because an objection to discharge must be based on the debtor's failure to produce books and records which depict the individual debtor's finances, not that of his or her corporation.

Krohn v. Cromer (In re Cromer), 214 B.R. 86, 99 (Bankr. E.D.N.Y. 1997); See also Phillips v. Nipper

(In re Nipper), 186 B.R. 284, 289 (Bankr. M.D. Fla. 1995) ("A debtor's discharge cannot be denied

where production of corporate financial records is inadequate because the corporation is a separate

entity."); JP Morgan Chase Bank v. Hobbs (In re Hobbs), 333 B.R. 751, 758 (Bankr. N.D. Tex. 2005)

(refusing to deny debtor's discharge based on the inadequate production of corporate records because

the debtor was in bankruptcy individually and, therefore, the corporate records were not within the

statute); Summers, 320 B.R. at 638 (overruling objection to discharge of debtor pursuant to §

727(a)(3) because the plaintiff introduced no evidence to show that the individual debtor failed to

keep or preserve records regarding his own personal business transactions-all of the records alleged

to be insufficient related to the debtor's wholly owned corporation; as such, the plaintiff failed to meet

its burden of proof at trial).

　　While it is the law that a debtor's discharge may not be denied solely on the basis of lack of

corporate records, this does not mean that a debtor's corporate records cannot be the basis for denying

a debtor's discharge. Section 727(a)(3) provides for the denial of discharge if a debtor fails to keep

or preserve records that are necessary to determine the debtor's financial condition. If a plaintiff is

able to show that corporate records are necessary to determine the debtor's financial condition, and the debtor has not kept or preserved such records, the debtor's discharge should be denied pursuant to § 727(a)(3). In re Nipper, 186 B.R. at 289 (sustaining plaintiff's objection to debtor's discharge because plaintiff argued that the records of debtor's corporation, of which the debtor was the sole officer and shareholder, "would reveal [debtor's] income from [the corporation] and possible transfer of assets prior to filing of the bankruptcy petition").[11] Some courts have specifically stated that corporate records are relevant to denial of discharge proceedings where the "financial condition of the individual debtor and the corporation are closely connected." Wachovia Bank v. Spitko (In re Spitko), 357 B.R. 272, 307 (Bankr. E.D. Pa. 2006). See also Sterling Int'l, Inc. v. Thomas (In re Thomas), No. 01-06321, 2003 WL 21981707, *11 (Bankr. D. Idaho July 17, 2003) ("[I]n situations where the facts indicate that a debtor exercised control over and conducted business through a closely held corporation, § 727(a)(3) inquiries cannot be artificially limited to those records that are, strictly speaking, those of the debtors."); In re Halpern, 387 F. 2d 312, 315 (2d Cir. 1968) ("Where the bankrupt . . . is the principal or a truly responsible officer of a corporation, and incurs substantial obligations as a result of corporate activities, he is required to keep books and records.").

In the present case, however, Plaintiff did not allege that the corporate records Debtor failed to produce were necessary to determine the personal finances of the Debtor. This court believes that the absence of any such allegation coupled with the rule that § 727 must be construed strictly against any creditor and liberally in favor of the Debtor, requires a finding by the court that the Plaintiff failed

---

[11]The court does not believe that the Nipper case stands for the proposition that anytime a debtor is a sole officer and shareholder, corporate records are required to determine the debtor's personal financial condition. The court would also note that the Debtor, unlike the debtor in Nipper, did produce corporate records, including the tax records of both Debtor's business entities.

13

to meet its burden of proof.  The Plaintiff, by failing to show that the corporate records were necessary to determine the financial condition of the Debtor, failed to show that the Debtor did not produce records necessary to determine the financial condition of the Debtor.

However, even if the Plaintiff had alleged that the corporate records of the Debtor were necessary to determine the financial condition of the Debtor, the Plaintiff did not prove this at trial. The parties stipulated to the admission of numerous documents.  These documents included transcripts of depositions, the Debtor's individual tax returns, and the tax returns of the Debtor's two business entities, Bishop Joint Sealing and Bishop Rentals.

Ingle, the Debtor's CPA, was deposed during this bankruptcy case and his deposition was admitted into evidence in this adversary proceeding.   During the deposition, Ingle was questioned about the accounting procedures at Bishop Joint Sealing.  Ingle responded that he could not state with confidence that Bishop Joint Sealing was following all of the standards of accounting procedure, but that its accounting was average for businesses of a similar size and nature. Ingle acknowledged that if a business does not have an accountant on staff, it is difficult for such business to be completely accurate in its record-keeping.  Bishop Joint Sealing did not have an accountant on staff, but Ingle considered Bishop Joint Sealing's record-keeping to be average for a business of its size and nature. (Debtor's Exhibit 5, pages 50-51; 67)

Debtor's records were either maintained by his wife, who is now his ex-wife, his daughter, or Warren.  Warren, an employee hired by the Debtor in 2004 who provided testimony as to how the records of Debtor's business entities were kept, testified  that file folders were maintained for each month, with expenses and invoices placed into each file folder.  Bank accounts and deposit slips were maintained for each company.  In addition to these records, a separate file folder for each rental

property owned by Bishop Rentals was kept. Each folder contained the documents related to a specific piece of property, e.g., the note or mortgage, as well as a notation of the monthly rent for that piece of property. Warren also kept a receipt book for rental payments and the rental payments were noted on each deposit slip. Warren further testified that the Debtor's daughter and Ingle prepared the payrolls and that Ingle would periodically come to the office and get what he needed. Warren further testified that the Chapter 7 Trustee took the deposition of the Debtor and that she brought all the loan and rental files to the Trustee's deposition. After the deposition, the Chapter 7 Trustee took possession of these records. Warren also produced all the month-to-month folders that were kept for Debtor's business entities to the Trustee. These month-to-month folders were in labeled boxes and contained all the bank statements, credit card statements, and other invoices of the Debtor's business entities. Defendant's Exhibit 17, a copy of the Debtor's Response to Request for Production, sets out numerous documents that were provided to the Chapter 7 Trustee, as well as the documents provided to the accountant retained by the Trustee to review the Debtor's financial status, prior to the Request for Production filed in this case. These records were available to Plaintiff for review. Defendant's Exhibit 17 further sets out numerous bank records provided to the Plaintiff. In addition, Defendant's Exhibit 16, which is a response to a prior motion for summary judgment, listed numerous bank account records which were provided to the Plaintiff.

Debtor has a sixth grade education and has done manual labor all of his life. Despite these limitations, Debtor was able to operate two businesses, Bishop Joint Sealing and Bishop Rentals. In operating these two business, Debtor kept separate checking accounts for each business, as well as monthly folders detailing income and expenses. Debtor also maintained separate folders for each item of rental property owned by Bishop Rentals. From these records, Ingle was able to prepare asset

Case 05-70042-CMS    Doc 128    Filed 02/06/09    Entered 02/06/09 15:13:10    Desc Main
Document        Page 15 of 28

and depreciation schedules, profit and loss statements, and balance sheets for both of Debtor's businesses. While it is true that Debtor did not maintain records consistent with Generally Accepted Accounting Principles, that is not the standard to which he is held. Debtor was only required to maintain and preserve books and records that others in like circumstances would ordinarily maintain. Ingle testified that Debtor's records were consistent with records kept by other business of a like size and nature, and Plaintiff submitted no evidence that would show that a similar individual or a business of like size and nature would have maintained anything more in the form of business records.

Therefore, this court finds that the Plaintiff failed to prove that the Debtor failed to keep or preserve recorded information necessary to determine the Debtor's financial condition or material business transactions. Therefore, the Plaintiff's objection to discharge pursuant to §727(a)(3) is overruled.

To establish a prima facie case under § 727(a)(4)(A), Plaintiff must establish by a preponderance of the evidence that: "'(1) [the debtor] made a statement under oath; (2) the statement was false; (3) [the debtor] knew the statement was false; (4) [the debtor] made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case.'" Spitko, 357 B.R. at 312 (quoting Beaubouef v. Beaubouef (Matter of Beaubouef), 966 F. 2d 174, 178 (5th Cir. 1992)). "False oaths sufficient to justify the denial of discharge include (1) a false statement or omission in the debtor's schedules or (2) a false statement by the debtor at the examination during the course of the proceedings." Id. See also Chalik v. Moorefield (In re Chalik), 748 F. 2d 616, 618 n. 3 (11th Cir. 1984) ("A knowing and fraudulent omission from a sworn Statement of Affairs or schedule may constitute a false oath."); In re Summers, 320 B.R. at 638-39.

The only evidence submitted by Plaintiff on this issue was the Debtor's schedules. In

particular, the Plaintiff alleges that the valuation of assets contained in the Debtor's schedules constitute a false oath because such valuations are inconsistent with the Debtor's Statement of Financial Condition dated April 25, 2002.[12]  The court does not believe, and will not hold, that valuations submitted by the Debtor three years prior to the filing of bankruptcy, without more, constitute sufficient proof that the valuations submitted by the Debtor on the bankruptcy petitions are false.  However, the court will address each assertion of the Plaintiff's in turn.

Plaintiff asserts that the Debtor's bankruptcy schedules are false because the value of real estate listed on the schedules is inconsistent with the value of real estate listed on the Statement of Financial Condition.  While it is true that the value of the real estate in Debtor's schedules varies markedly from the value of the real estate in Debtor's Statement of Financial Condition, the evidence indicates that this difference in value is due to the numerous prepetition foreclosures on rental properties owned by Bishop Rentals.  When the Internal Revenue Service intercepted the rental

_____

[12]Plaintiff's Exhibit 7 to the Debtor's deposition is a copy of the Debtor's Statement of Financial Condition dated April 25, 2002.  It lists assets and liabilities and computes the Debtor's net worth.  The Debtor testified that he did not fill out the Statement of Financial Condition and that he assumed Ingle filled it out because when the Bank needed financial information Debtor told them to contact Ingle.  However, Ingle testified in his deposition that he did not prepare the Statement of Financial Condition.  Although it is not clear who exactly filled out the Statement of Financial Condition, the evidence was clear that the Debtor did not have the education to prepare such a document personally.  For example, included under liabilities was installment accounts - automobiles for $52,388.24 and mortgages on real estate for $1,045,673.58.  These liabilities were to the penny.  The Statement of Financial Condition also contained two notes concerning the information provided.  The Statement of Financial Condition reflected a $1,000.00 value for the Debtor's stock in Bishop Joint Sealing.  The Statement of Financial Condition noted "1,000 shares of $1 par common. Represents 100% of the outstanding stock."  A second note related to the real estate stated "income from rental property pays the expenses and debt service on rental property. [Debtor] does not draw money from rental activities." Debtor did not have the education or financial wherewithal to make these notes on the Statement of Financial Condition.  Despite the fact that Debtor did not fill out the Statement of Financial Condition, Debtor did sign it.

17

payments due to Bishop Rentals, Bishop Rentals was no longer able to make the mortgage payments and the banks began to foreclose upon the rental properties. Any property that the bank foreclosed upon prepetition would not be the Debtor's real property on the petition date and would not be included in any valuation of real property contained in the Debtor's schedules. Therefore, the discrepancy in value can be explained by the difference in the number of rental properties at the time of the signing of the Statement of Financial Condition and the filing of the bankruptcy petition. Because the Plaintiff did not provide any evidence that the Debtor owned any real estate which was not scheduled and valued at the time of filing of his bankruptcy petition, the prepetition mortgage foreclosures constitute the only evidence of any loss of real estate suffered by the Debtor. The court finds that the discrepancy in the value of real property reflected on the Statement of Financial Condition and the Debtor's Schedules does not constitute proof that Debtor made a false oath.[13]

Plaintiff asserts that the Debtor's bankruptcy schedules are false because the value of automobiles listed on the schedules is inconsistent with the value of automobiles listed on the Statement of Financial Condition. Debtor listed $50,000.00 in automobiles on the Statement of Financial Condition.[14] A review of Schedule B of Debtor's petition reflects $34,000.00 in automobiles owned by him at the time the petition was filed. The court would first note that cars depreciate very quickly, losing most of their value in the first few years after purchase. Therefore, evidence that the Debtor valued automobiles at $50,000.00 on his Statement of Financial Condition,

_____

[13]The real estate the Debtor owned in 2002, as reflected on the Statement of Financial Condition, is not evidence of the real estate the Debtor owned in May of 2005 when his bankruptcy petition was filed.

[14] The Statement of Financial Condition also indicated the Debtor owed $52,388.24 on installment accounts for these automobiles.

18

is not sufficient evidence that Debtor's valuation of $34,000.00 three years later constitutes a false

oath. In addition, the court would note that two vehicles which served as collateral for the Plaintiff's

loan were repossessed prepetition. This could also account for the discrepancy in valuation for

Debtor's automobiles. There being no evidence that the Debtor failed to schedule any automobiles

which he owned at the time of filing, the court finds that the discrepancy in the value of automobiles

reflected on the Statement of Financial Condition and the Debtor's Schedules does not constitute

proof that Debtor made a false oath.

Plaintiff asserts that the Debtor's bankruptcy schedules are false because the value of

household goods listed on the schedules is inconsistent with the Statement of Financial Condition.

The Statement of Financial Condition listed the value of "household furnishings, jewelry, etc." at

$149,300.00, while Schedule B values household goods at $1,200.00. The Debtor testified that when

Community Bank needed financial information, he told them to contact Ingle. He further testified

that the $149,300.00 entry for "household furnishings, jewelry, etc." was not accurate and that he

never owned household goods worth that much. Debtor's testimony was credible, and the court

believes that he never had $149,000 worth of household goods, jewelry, etc. In addition, the Debtor

was married at the time the Statement of Financial Condition was filled out and divorced at the time

he filed this bankruptcy petition. Jewelry and other items would be divided between the parties and

this would result in a lesser value of household goods owned by the Debtor. Also the value attributed

to household goods retained by the Debtor would have depreciated between the 2002 Statement of

Financial Condition and the 2005 bankruptcy petition. In the absence of any evidence that the Debtor

failed to schedule any item of household goods or other personal property which he owned at the time

of filing of his bankruptcy petition and having heard the testimony and observed the Debtor, the court

19

does not find that the Debtor made a false oath when he valued his household goods on his bankruptcy schedules.

Plaintiff asserts that the Debtor's bankruptcy schedules are false because the value of Bishop Joint Sealing listed on the schedules is inconsistent with the 2004 tax return for Bishop Joint Sealing. Debtor's Schedule B valued Bishop Joint Sealing at $0.00, while the 2004 tax return for Bishop Joint Sealing, filed only ten days before the Debtor filed this bankruptcy petition, showed total gross revenue of $780,132.00 with $47,032.00 in income. However, the value of a business is not solely determined by the amount of revenue that such business does. In addition, the Debtor testified that he ceased operations of Bishop Joint Sealing in May 2005 after the Sweepers were repossessed by the Plaintiff. In the absence of any evidence to the contrary, this court finds that Bishop Joint Sealing had no value at the time the Debtor's bankruptcy petition was filed and that the Debtor's valuation listed on Schedule B is correct. Therefore, the discrepancy between the value listed on Schedule B and the amount of revenue shown on Bishop Joint Rentals 2004 tax return, does not constitute proof that Debtor made a false oath. Cadlerock Joint Venture II, L.P. v. Robbins (In re Robbins), 386 B.R. 636, 641-42 (Bankr. W.D. Ky. 2008) (overruling plaintiff's objection to discharge pursuant to § 727(a)(4) for failure to establish that debtor made a false oath where plaintiff premised its cause of action primarily on debtor's assigning a zero value on the debtor's business entity and plaintiff failed to show that business entity had any value at the time of the filing of the bankruptcy petition).

Because the Plaintiff failed to show that any of the Debtor's schedules were false, it has not met its burden of proof in showing that the Debtor made a false oath or account. As such the court overrules the Plaintiff's objection to discharge pursuant to § 727(a)(4)(A).

To establish a prima facie case under § 727(a)(5), Plaintiff must establish by a preponderance

20

of the evidence that the Debtor: (1) experienced a loss or deficiency of assets; and (2) cannot provide

a satisfactory explanation for such loss. 11 U.S.C. § 727(a)(5). The Plaintiff primarily contends that

there is an unexplained loss of the real estate held by Bishop Rentals and that there is an unexplained

loss of Debtor's personal property. The Plaintiff again relies on the difference in the valuation of

assets contained in the Debtor's schedules and the Debtor's Statement of Financial Condition. The

facts underlying this issue are basically the same as those facts underlying the § 727(a)(4) issue.

As to the real estate, the court finds that the Plaintiff did not meet its burden in proving that

the real estate listed on the Statement of Financial Condition and Schedule A constitutes an asset of

the Debtor. The testimony at trial indicated that all of the real estate listed and valued on Schedule

A of the Debtor's petition was actually owned by Debtor's L.L.C., Bishop Rentals. The tax returns

in evidence for Bishop Rentals itemize parcels of real estate which purportedly are owned by Bishop

Rentals. Debtor's bankruptcy petition lists real estate, some of which is the same real estate as

reflected on the real estate list of Bishop Rentals. Because Plaintiff failed to introduce the titles to

these various pieces of real estate, there was no evidence as to which parcels of real estate were

owned by Bishop Rentals, and which parcels of real estate were owned by Debtor individually. If the

parcels of real estate were owned by Bishop Rentals, such parcels would not constitute an asset of the

Debtor and the loss of such parcels would not constitute grounds for the denial of Debtor's general

discharge. Therefore, in the absence of any proof that Debtor owned the real estate that Plaintiff

alleges was lost, this court must find that the Plaintiff failed to prove that the Debtor experienced a

loss of assets. State Bank of India v. Chachra (In re Chachra), 138 B.R. 397, 403 (Bankr. S.D.N.Y.

1992) (stating that debtor was under no duty to explain the loss of the corporation's assets as debtor

only has a duty to explain loss of assets owned by debtor personally); Notinger v. Liimatainen (In

re Liimatainen), No. 01-01218, 2002 WL 31317182, *6 (Bankr. D.N.H. Oct. 10, 2002) (holding that court could not deny a debtor's discharge pursuant to § 727(a)(5) based on assets of debtor's corporation because the assets of the corporation are not assets of the bankruptcy estate, as such any loss or reduction of those assets cannot form the basis for denying debtor's discharge).

Even if the rental property was owned by the Debtor individually, the Debtor sufficiently explained the loss of such rental property. The evidence proved that the IRS began intercepting all of Bishop Rentals' rent payments, and that once this happened, Bishop Rentals was no longer able to make the mortgage payments on the rental properties. Shortly thereafter, the various mortgage holders began foreclosing upon the rental properties. Because there was no evidence that Debtor lost any real estate that was not foreclosed upon, this court finds that Debtor sufficiently explained any loss of real estate that occurred prepetition. Therefore, Plaintiff failed to prove that Debtor suffered an unexplained loss of real estate as required by § 727(a)(5).

Plaintiff also alleges that Debtor failed to explain a loss of personal property, more specifically household furnishings. This allegation is identical to the allegation involved above in the discussion pertaining to § 727(a)(4)(A). For the same reasons the court found that Plaintiff did not meet its burden of proof pursuant to that subsection, the court will find that the Plaintiff failed to meet its burden of proof in showing that the Debtor suffered an unexplained loss of assets: (1) The court is not convinced that Debtor ever owned $149,300.00 worth of household furnishings, jewelry, etc; (2) The Debtor's divorce, which occurred between the 2002 Statement of Financial Condition and the 2005 bankruptcy petition and which would result in a division of personal property, explains why the Debtor would have more personal property when he executed the Statement of Financial Condition than when he filed the bankruptcy petition; and (3) Household furnishings, jewelry, etc. all constitute

22

personal property which would have depreciated between the 2002 Statement of Financial Condition

and the 2005 bankruptcy petition.   Having heard the testimony and observed the Debtor, the court

does not find that Debtor has suffered any loss or deficiency of assets for which he has failed to

satisfactorily explain.[15]   Therefore, the court overrules the Plaintiff's objection to discharge pursuant

to § 727(a)(5).

## II. Section 523

Because the court overruled the objections to discharge brought pursuant to § 727, the court

must now determine whether the specific debt owed to Plaintiff is a nondischargeable debt pursuant

to § 523(a)(2).  If a debtor is granted a general discharge pursuant to § 727, all of a debtor's debts are

discharged except for debts of the type listed in § 523(a).  Plaintiff asserts that the debt owed to it is

excepted from discharge pursuant to § 523(a)(2).   Section 523 provides, in pertinent part, that:

> (a) A discharge under 727 . . . . of this title does not discharge an individual debtor from any debt-
>
> > (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by-
> > (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;
> >
> > (B) use of a statement in writing-

---

[15]This court would note that it is aware of the 11th Circuit decision holding that a vast discrepancy in value between a debtor's prepetition financial statement and chapter 7 schedules is grounds for denial of discharge.  Hawley v. Cement Indus. (In re Hawley), 51 F. 3d 246, 249 (11th Cir. 1995).  The situation in Hawley, however, was vastly different.  First, the debtor in Hawley filed bankruptcy in 1990, while he submitted the prepetition financial statement in 1989. Id. In this case, there was a three year period between the Statement of Financial Affairs and the filing of Debtor's bankruptcy petition.  Also, in Hawley the debtor admitted that he lost assets worth over $13 million.  Id.  In this case, even if the court believed that Debtor at one time owned $149,300.00 worth of personal property, which as detailed above it does not, Debtor would have lost assets worth $148,000.00.  The court does not believe that the Hawley case is controlling in this situation.

23

(i) that is materially false;
(ii) respecting the debtor's or an insider's financial condition;
(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
(iv) that the debtor caused to be made or published with the intent to deceive;

11 U.S.C. § 523(a)(2). Section 523(a)(2) has two subsections, (A) and (B). Subsection 523(a)(2)(A) provides that debts will not be discharged to the extent that the debtor obtained them by false pretenses, a false representation or actual fraud. Subsection 523(a)(2)(B) provides that debts will not be discharged if they were obtained by the use of false financial documents or statements. "Paragraphs (A) and (B) of § 523(a)(2) are mutually exclusive-the fact that Congress excluded debts obtained through use of false financial statements from paragraph (A), and dealt with those debts in a separate subparagraph (B), makes clear that a plaintiff must prove different evidence for each subsection." Gieseking v. Thomas, 358 B.R. 754, 766 (Bankr. S.D. Ill. 2007). See also Fairfax State Savings Bank v. McCleary (In re McCleary), 284 B.R. 876, 883 (Bankr. N.D. Iowa 2002). The only proof offered by Plaintiff at trial that went to the circumstances under which Community Bank[16] agreed to loan the Debtor money were the Credit Application and the Statement of Financial Condition. As both of these documents are written statements respecting the Debtor's financial condition, Plaintiff failed to offer evidence that would support a finding of a nondischargeable debt pursuant to § 523(a)(2)(A). In re McCleary, 284 B.R. at 884. Therefore, this court will only address § 523(a)(2)(B) in determining whether the debt owed to Plaintiff should be declared

---

[16] Plaintiff need only prove that Community Bank relied upon the Consumer Credit Application and Statement of Financial Condition when making the decision to loan Debtor money; Plaintiff does not have to show that it relied upon those documents when it decided to purchase the loans. New Falls Corp. v. Boyajian (In re Boyajian), 367 B.R. 138, 148 (9th Cir. BAP 2007).

24

nondischargeable.

In a trial to determine dischargeability of a debt, the plaintiff bears the burden of proof and must meet this burden by a preponderance of the evidence. Grogan, 498 U.S. at 291. To establish a prima facie case under § 523(a)(2)(B), the Plaintiff must establish by a preponderance of the evidence that: (1) the debt was obtained by use of a statement in writing; (2) such writing was materially false; (3) such writing was with respect to the debtor's financial condition; (4) the creditor to whom the debt is owed reasonably relied on such writing; and (5) the debtor caused such writing to be made or published with the intent to deceive. Equitable Bank v. Miller (In re Miller), 39 F. 3d 301, 304 (11th Cir. 1994). If Plaintiff fails to meet its burden on any of these elements, the debt is dischargeable. Id. Exceptions to discharge are construed strictly against a creditor and liberally in favor of a debtor. Id.; Gieseking, 358 B.R. at 766. This court finds that Plaintiff failed to show that Community Bank reasonably relied on the Consumer Credit Application and Statement of Financial Condition in making Loan 1 and Loan 2 to the Debtor. As such, this court will not address whether Plaintiff met its burden of proof as to the other elements of § 523(a)(2)(A).

The testimony of Bruce Allen Eddy ("Eddy"), a market manager at Superior Bank which acquired Community Bank, was the only evidence at trial that went to the reliance of Community Bank on the documents submitted by the Debtor with his loan application. Eddy testified that it was the pattern and practice of Community Bank to obtain a loan application before approving a loan, and that the basic information collected for a loan application relates to income, debts, and assets of the applicant.[17] Eddy acknowledged that Debtor's loan application was incomplete in that it contained

_____

[17]While this court finds the testimony of Eddy extremely credible as to the bank's current policy in making loans, it does not believe that his testimony is relevant to the practices of Community Bank when Loans 1 and 2 were made. First, Eddy was not involved in the

Case 05-70042-CMS    Doc 128    Filed 02/06/09    Entered 02/06/09 15:13:10    Desc Main
Document      Page 25 of 28

many blanks and did not include any listing of the Debtor's assets. He further testified that while the Statement of Financial Condition was included in the bank file, he did not know if it was considered by the loan officer when approving the Loans.

In addition to the testimony of Eddy, Plaintiff asserts that Community Bank relied on specific false information contained in the Consumer Credit Application dated June 27, 2002, and the Statement of Financial Condition dated April 25, 2002. Plaintiff first asserts that Debtor lied about his income. Specifically, Plaintiff asserts that Debtor overstated his income by showing $6,000.00 per month as rental income on the Consumer Credit Application. However, the Statement of Financial Condition specifically states that Debtor draws no rental income. Because these documents contradict each other, the court finds it hard to believe that Community Bank relied on either one in determining the Debtor's income for the purposes of making Loans 1 and 2. Plaintiff also asserts that the $11,000.00 salary reflected in the Consumer Credit Application is false. However, the Debtor's individual 2002 income tax return reflects taxable income for the year of 2002 in the amount of $142,469.00, which equates to $11,872.00 per month. Therefore, the court does not believe that the Plaintiff proved that Community Bank relied on the Consumer Credit Application and the Statement of Financial Condition in determining the Debtor's income.

Plaintiff also asserts that Debtor lied about his debts. Specifically, Plaintiff asserts that Debtor substantially understated his debts on the Consumer Credit Application. The Consumer Credit Application shows two debts owed to Community Bank which would be paid by Loan 1 and a debt owed to First Premier in the amount of $178.00. However, this again is not consistent with the

---

processing of either loan. Second, Eddy did not have the authority to approve loans when Loans 1 and 2 were approved. As such, the court is not convinced that Eddy would know what the loan officer who approved Loans 1 and 2 relied upon in deciding to approve the Loans.

26

Statement of Financial Condition which listed the Debtor's liabilities at $1.1 million. Because these documents contradict each other, the court finds it hard to believe that Community Bank relied on either one in determining the Debtor's liabilities for the purposes of making Loans 1 and 2. In addition, the Consumer Credit Application shows that Community Bank ran a credit report on the Debtor. This credit report indicated that the Debtor had excellent credit and would reflect the outstanding liabilities of the Debtor. Therefore, the court does not believe that the Plaintiff proved that Community Bank relied on the Consumer Credit Application and the Statement of Financial Condition in determining the Debtor's liabilities.

The evidence at trial further established that the Debtor had a long and close personal relationship with Steve Lolly ("Lolly"), the loan officer who approved Loans 1 and 2. This long relationship was acknowledged by Eddy. The Debtor testified that when he needed money he would call Lolly. Lolly would prepare any needed paper work and Debtor would stop by a few days later to sign the documents. If the bank needed any information, a call to the Debtor's accountant was made. The Consumer Credit Application is consistent with the Debtor's testimony: Loan 1 was approved the day before the Debtor signed the application. In addition, Loan 2 was made without a second credit application. The court finds that the loan officer approved these loans, not because of any credit application or statement of financial condition, but rather approved the loans based upon a long standing relationship with the Debtor, as well as the Debtor's excellent credit score.

Therefore, the Plaintiff failed to meet its burden of proof by failing to show that Community Bank reasonably relied on the credit application and statement of financial condition and its objection to the dischargeability of its debt pursuant to § 523(a)(2)(A) is overruled.

Case 05-70042-CMS    Doc 128    Filed 02/06/09    Entered 02/06/09 15:13:10    Desc Main
Document      Page 27 of 28

**CONCLUSION**

The court finds that the Plaintiff failed to meet its burden of proof as to its Objection to Discharge pursuant to §§ 727(a)(3), (a)(4)(A), & (a)(5).  The court also finds that the Plaintiff failed to meet its burden of proof as to its Objection to Dischargeability pursuant to § 523(a)(2).  Therefore, the court **OVERRULES** all of the Plaintiff's objections contained in the Amended Complaint.

An Order, consistent with these findings pursuant to Fed. R. Bankr. P. 7052, will be entered separately.

**DONE and ORDERED** this February 6, 2009.

/s/ C. Michael Stilson
C. Michael Stilson
United States Bankruptcy Judge
